UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JSC DTEK KRYMENERGO,

    *Plaintiff*,

v.

RUSSIAN FEDERATION,

    *Defendant*.

Civil Action No. 1:23-cv-03330 (CJN)

**MEMORANDUM OPINION**

JSC DTEK Krymenergo, a Ukrainian energy supplier, initiated this action to confirm an arbitral award that it secured against the Russian Federation after Russia invaded Crimea and expropriated DTEK Krymenergo's assets there. The Russian Federation moved to dismiss on the grounds that the Court lacks both subject matter and personal jurisdiction under the Foreign Sovereign Immunities Act, and then later moved to stay these proceedings pending the outcome of additional arbitral and judicial proceedings in other fora. For the reasons below, the Court denies both of Russia's motions.

**I.  Background**

    **A.  Factual Background**

JSC DTEK Krymenergo is a subsidiary of DTEK Energy Group, one of the largest privately-owned energy distributors in Ukraine. ECF No. 1-2 (Award) ¶¶ 2–3, 191–93. Before Russia occupied Crimea in February 2014, DTEK Krymenergo was a major energy supplier there: it provided electricity to more than 780,000 Crimean customers across 23 regional electricity networks and 27,000 square kilometers. *Id.* ¶¶ 191–93. DTEK Krymenergo's assets in Crimea

1

included real estate, equipment and other physical property, license and contract rights, securities, and cash.  *Id.* ¶ 192.

On March 18, 2014, the Russian Federation formally annexed Crimea and extended the application of Russian law to the territory.  *Id.* ¶ 196.  On April 30, 2014, the State Council of the Republic of Crimea issued an expropriation resolution providing that certain categories of property in the region, including Ukrainian state-owned property and abandoned property, would thereafter "be considered the property of the Republic of Crimea."  *Id.* ¶ 668.  DTEK Krymenergo's assets were not covered by the original April 2014 resolution.  *Id.* ¶ 669.  But on January 21, 2015, the Crimean Parliament amended the resolution to specifically state that all of DTEK Krymenergo's tangible and intangible assets in Crimea were also transferred to the ownership of the Republic of Crimea.  *Id.* ¶¶ 206, 695.  The same day, uniformed men took control of DTEK Krymenergo's premises and denied its managers reentry.  *Id.* ¶¶ 206, 677.  To date, DTEK Krymenergo has not received any compensation from Russian or Crimean authorities for its expropriated assets.  *Id.* ¶¶ 674–79.

**B.     Arbitral Proceedings**

On February 16, 2018, DTEK Krymenergo commenced arbitration against the Russian Federation pursuant to the 1998 Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments.[1]  *Id.* ¶¶ 1, 18.  The stated purpose of that Agreement, known as the Ukraine-Russia Bilateral Investment Treaty, or BIT, is to "encourage" cross-border investments between the two nations by offering reciprocal protections to qualifying investors.  ECF No. 1-3 (BIT) art. 2.  Those

---

[1] The Ukraine-Russia BIT was terminated on January 27, 2025, at Ukraine's option.  *See* ECF No. 13-3 at 105.

protections cover "investments made by investors of one Contracting Party in the territory of the other Contracting Party, on or after January 1, 1992." *Id.* art. 12.  Relevant here, the BIT defines Russian "territory" as "the territory of the Russian Federation . . . as well as [its] . . . exclusive economic zone and the continental shelf, defined in accordance with international law." *Id.* art. 1(4).

When the BIT applies, it requires Russia and Ukraine to refrain from discriminating against each other's cross-border investments, as well as from expropriating them absent due process of law and prompt, adequate, and effective compensation.  *Id.* arts. 3–6.  The BIT further commits both nations to arbitrate "[a]ny dispute between one Contracting Party and an investor of the other Contracting Party arising in connection with investments." *Id.* art. 9(1).  Such arbitration may be conducted under the auspices of the Arbitration Institute of the Stockholm Chamber of Commerce, or in an "ad hoc" arbitration in accordance with the Arbitration Rules of the United Nations Commission for International Trade Law of 1976 (UNCITRAL).  *Id.* art. 9(2).  DTEK Krymenergo opted to challenge the expropriation of its Crimean property under the UNCITRAL Rules.  Award ¶ 1.

Because the Russian Federation initially declined to participate in the arbitration, it was not involved in appointing any of the arbitrators to the ad hoc tribunal.  *Id.* ¶¶ 18–22.  Instead, DTEK Krymenergo appointed the first arbitrator, and the Permanent Court of Arbitration selected the second arbitrator on Russia's behalf.  *Id.* ¶¶ 18–21.  Those two arbitrators together appointed the Presiding Arbitrator.[2]  *Id.* ¶ 22.  In April 2019, over a year after DTEK Krymenergo submitted

---

[2] The first Presiding Arbitrator resigned in June 2020 due to his relationship with DTEK Krymenergo's expert.  Award ¶¶ 73–86.  He was then replaced by a different Presiding Arbitrator chosen by the same method.  *Id.* ¶ 92.

its request for arbitration, the Russian Federation informed the tribunal it wished to join the proceedings. *Id.* ¶ 26.

From then on, both parties participated actively in the arbitration, which ultimately involved multiple rounds of briefing, a week-long hearing at The Hague in September 2021, and two rounds of post-hearing briefs and submissions on costs. *Id.* ¶¶ 26–134. The Russian Federation raised various objections to the tribunal's jurisdiction throughout those proceedings, including by arguing that the BIT did not apply because DTEK Krymenergo's energy-infrastructure investments were not in Russian territory at the time they were made and because, in any event, Crimea's territorial status remains subject to dispute. *Id.* ¶¶ 227, 381. But when the tribunal issued its award in November 2023, a majority of the arbitrators rejected Russia's objections and held they had jurisdiction over DTEK Krymenergo's claims. *Id.* ¶¶ 1030(1)–(4), (6). On the merits, the majority concluded that Russia had breached the BIT by failing to protect DTEK Krymenergo's investments in Crimea, by subjecting DTEK Krymenergo to discriminatory treatment, and by expropriating DTEK Krymenergo's property without compensation, due process of law, and consideration of the public interest. *Id.* ¶¶ 653–786, 827–33, 1030(7). Although the arbitrator appointed for the Russian Federation dissented from some of the majority's conclusions, he did not issue a separate opinion. *See id.* ¶ 1030.

To redress the breaches it identified, the tribunal awarded DTEK Krymenergo $207.8 million in compensatory damages, plus pre- and post-award interest. *Id.* ¶ 1030(8). (The arbitrator appointed by DTEK Krymenergo would have awarded more compensation, and so dissented from that portion of the award.) *Id.* at 201–03. The tribunal also awarded DTEK Krymenergo the costs and expenses of arbitration, which it calculated at over $10 million. *Id.* ¶ 1030(9).

In February 2024, Russia moved The Hague Court of Appeal to set aside the tribunal's award. ECF No. 14-1 ¶ 3. Those proceedings are ongoing, and The Hague Court of Appeal has not yet rendered any decisions. *Id.*

### C.     District Court Proceedings

The same month the tribunal issued the award, DTEK Krymenergo filed this action, in which it petitions this Court to confirm the award pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the New York Convention). ECF No. 1 (Pet.) ¶ 4. After DTEK Krymenergo effected proper service, the Russian Federation moved to dismiss, arguing that the Court lacks subject matter jurisdiction under the FSIA and that its exercise of personal jurisdiction over Russia would violate due process. *See* ECF No. 9; ECF No. 13 (MTD). While that motion was pending, Russia moved to stay proceedings pending both the conclusion of the Hague set-aside proceedings and the disposition of several purportedly related cases in the Court of Appeals and the Supreme Court. *See* ECF No. 19 (MTS). DTEK Krymenergo opposes both the motion to dismiss and the stay motion. *See* ECF No. 14 (MTD Opp.); ECF No. 21 (MTS Opp.).

## II.    Legal Standard

"[O]n a motion to dismiss under the FSIA where [the foreign sovereign] ha[s] not disputed any facts," courts "must assume the truth of [the petitioner's] allegations, make all reasonable inferences in [its] favor, and . . . place the ultimate burden of proof with [the sovereign]." *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018). "Thus, where the [foreign sovereign] contests only the legal sufficiency of [the petitioner's] jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief."

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). A foreign state "bears the burden of proving sovereign immunity, including that the [petitioner's] allegations do not bring its case within a statutory exemption to immunity." *Schubarth*, 891 F.3d at 398 (quotation marks omitted).

Even before establishing jurisdiction, courts have an inherent "power to stay proceedings" in order to control their dockets "with economy of time and effort for [the judicial system], for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 38–39 (D.D.C. 2019). In determining whether a stay is warranted, courts must "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (quotation marks and citations omitted).

### III.     Motion to Dismiss

"Federal courts may exercise jurisdiction over claims against a foreign state" like Russia "only pursuant to the FSIA." *Schubarth*, 891 F.3d at 398 (citing 28 U.S.C. § 1604). The FSIA "establishes a default rule of foreign sovereign immunity," *id.*, thereby depriving courts of subject matter jurisdiction in "every action against a foreign sovereign" unless one of the FSIA's textually enumerated "exceptions to foreign sovereign immunity" applies. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) (citing 28 U.S.C. § 1330(a)); *see* 28 U.S.C. §§ 1605, 1607. The FSIA also governs the exercise of personal jurisdiction over a foreign state, requiring as preconditions for personal jurisdiction that (1) subject matter jurisdiction be "satisfied" via a specified immunity exception and (2) service be proper. *Schubarth*, 891 F.3d at 397 n.1 (citing 28 U.S.C. § 1330(b)).

In its motion to dismiss, Russia challenges the Court's exercise of both subject matter jurisdiction and personal jurisdiction. Neither challenge has merit.

### A. Subject Matter Jurisdiction

As noted, the FSIA's default rule of foreign sovereign immunity is subject to several exceptions. One provides that foreign states are subject to federal jurisdiction in actions brought "to confirm an award made pursuant to . . . an agreement to arbitrate," as long as the agreement is "made by the foreign state with or for the benefit of a private party" and "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). To proceed under this so-called "arbitration exception," a petitioner must "satisfy a burden of production" as to three "jurisdictional facts": "(1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024). If the petitioner carries that burden, the exception applies unless the foreign state "establish[es] the absence of the factual basis by a preponderance of the evidence." *Id.*

DTEK Krymenergo has met its initial burden of production by pointing to (1) the Ukraine-Russia BIT, (2) the arbitral award issued under that BIT, and (3) the New York Convention—"an international treaty obligating member states," including Russia, the United States, and the Netherlands, "to recognize and enforce arbitral awards issued in other member states."[3] *Process & Indus. Dev. (P&ID) v. Fed. Rep. of Nigeria*, 27 F.4th 771, 772 (D.C. Cir. 2022) (citing June 10, 1958, 21 U.S.T. 2517); *Contracting States*, New York Arbitration Convention, *available*

---

[3] The Netherlands is the location of the arbitral proceedings at issue here. *See* Award ¶¶ 13–14, 49.

*at* https://www.newyorkconvention.org/countries (last visited April 14, 2025); *see Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015) ("Chevron has met its burden of production by producing the BIT, Chevron's notice of arbitration against Ecuador, and the tribunal's arbitration decision."); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 n.3 (D.C. Cir. 2021) ("Nor is there doubt that the New York Convention, ratified by the United States, calls for the enforcement of arbitral awards."). But Russia challenges DTEK Krymenergo's showings as to the first and third jurisdictional facts, arguing that "[t]he Federation never agreed to arbitrate with [DTEK Krymenergo], and the Award is not governed by any treaty in force in the United States calling for the recognition and enforcement of arbitral awards." MTD at 11.

The Court disagrees on both points.

    **1.**    **Arbitration Agreement**

The arbitration exception "requires a valid 'agreement . . . to submit to arbitration,'" and "whether a valid arbitration agreement exists" is a question for courts, not arbitrators, to resolve. *Gov't of Belize*, 794 F.3d at 102 (quoting 28 U.S.C. § 1605(a)(6)); *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 998 F.3d 449, 457 (D.C. Cir. 2021). Here, Russia argues that it never entered a valid arbitration agreement with DTEK Krymenergo because the "standing offer to arbitrate" set forth in the Ukraine-Russia BIT "was directed only to Ukrainian investors who chose to invest in Russian 'territory'" after 1992. MTD at 14, 22. According to Russia, DTEK Krymenergo is "a Ukrainian entity" that, notwithstanding Russia's later invasion of Crimea, "chose to invest in Ukraine"—and did so with assets "which . . . pre-date 1992." *Id.* Moreover, according to Russia, "that Ukraine disputes Russia's sovereignty over Crimea" itself defeats "the existence of an agreement to arbitrate in this case, as it shows that

8

the contracting parties have no common understanding of the meaning of the term 'territory.'" *Id.* at 17.

Russia's arguments incorrectly conflate the "arbitrability" of its dispute with DTEK Krymenergo—that is, whether Russia "agreed to arbitrate this *particular* dispute"—with the *jurisdictional* question of whether an arbitration agreement exists—which is whether Russia "agreed to arbitrate *certain* disputes" with Ukrainian investors. *Stileks*, 985 F.3d at 878 (second emphasis added). In *Stileks*, for example, the Court of Appeals confronted Moldova's argument that the arbitral award in question was not "made pursuant to . . . an agreement to arbitrate" under 28 U.S.C. § 1605(a)(6) because the claimant was "not a qualifying investor" under the relevant bilateral arbitration treaty.[4] *Id.* at 877–78. The Court explained that, "[i]f Moldova [wa]s correct, it might have a defense to confirmation under the New York Convention, which provides for non-recognition of an award if '. . . it contains decisions on matters beyond the scope of the submission to arbitration.'" *Id.* at 878 (quoting New York Convention, art. V(1)(c)). But the Court held that Moldova did not have a *jurisdictional* defense, because "*the arbitrability of a dispute is not a jurisdictional question under the FSIA*." *Id.* (emphasis added); *see also NextEra*, 112 F.4th at 1101 ("It is well established in this Circuit that *disputes about the scope of an arbitration agreement, such as whether [it] covers a particular dispute, are not jurisdictional questions under the FSIA*.") (emphasis added). "For jurisdictional purposes, the FSIA's arbitration exception requires that the arbitral tribunal purported to make an award pursuant to the [BIT], not that it in fact did so." *NextEra*, 112 F.4th at 1104 (quotation marks omitted).

---

[4] The Federation thus errs in arguing that, in *Stileks*, it was "unquestionabl[e]" that "[t]he claimants were investors with authority to accept the standing offer to arbitrate." ECF No. 15 (MTD Reply) at 13.

9

At the very least, the arbitral tribunal here "purported" to make an award under the BIT. In particular, as in other cases, "the tribunal concluded that the BIT gave it jurisdiction and it premised [DTEK Krymenergo's] award on Russia's alleged breach of the BIT." *Stabil LLC v. Russian Fed'n*, 2024 WL 5093202, at *3 (D.D.C. 2024); *see* Award ¶¶ 1, 1030. And Russia disputes neither the existence of the BIT nor the fact that the BIT committed Russia to arbitrate investment disputes with *some* Ukrainian investors.

Instead, Russia argues that *DTEK Krymenergo's* claims are not covered by the BIT, because while Russia extended some arbitration offers, it "never extended an offer to arbitrate to [DTEK Krymenergo]." ECF No. 15 (MTD Reply) at 3. As much as Russia attempts to portray this question as one about the existence of an arbitration agreement, in this circuit it is plain that this argument goes to the agreement's scope. *See NextEra*, 112 F.4th at 1103 (Spain's argument "that the standing offer to arbitrate contained in [the BIT] d[id] not extend to EU nationals" was "an argument regarding the *scope* of the [BIT], not its *existence*"). This argument is therefore irrelevant to the Court's exercise of jurisdiction under FSIA's arbitration exception—which in this context demands only that "[t]he BIT includes a standing offer to all potential [Ukrainian] investors to arbitrate investment disputes" and that DTEK Krymenergo "accepted [the offer] in the manner required by the treaty." *Chevron*, 795 F.3d at 206; *see also NextEra*, 112 F.4th at 1102 ("[A]n investment treaty's arbitration provision operates as a unilateral offer to arbitrate by each sovereign to investors of the other signatory countries.") (quotation marks omitted). Because Russia does not and cannot contest that those preconditions are met here, it "has not rebutted [DTEK Krymenergo's] factual support for the existence of an arbitration agreement." *Stabil*, 2024 WL 5093202, at *4 (finding non-jurisdictional Russia's argument that Ukraine-Russia BIT did not extend to investment made in Crimea prior to Russian occupation).

10

2.   **Applicable Treaty**

To proceed under the arbitration exception, a plaintiff must also proffer "a treaty potentially governing award enforcement" in the United States. *NextEra*, 112 F. 4th at 1100–01. As noted above, the New York Convention has been signed by Russia, the United States, and the Netherlands, and generally permits the enforcement here of arbitral awards made elsewhere. *See Stabil*, 2024 WL 5093202, at *4. Still, Russia argues that the New York Convention does not permit the enforcement of *this* award because it "only governs awards arising out of a commercial relationship between the parties" and "[n]o such commercial relationship exists between Russia and [DTEK Krymenergo]." MTD at 22.

It is true that the United States adopted a "commercial reservation" when signing the New York Convention, thereby limiting its enforcement scope to arbitral awards "arising out of a legal relationship, whether contractual or not, which is considered as commercial." *Zhongshan Fucheng Indus. Inv. Co. LTD v. Fed. Republic of Nigeria*, 112 F.4th 1054, 1059 (D.C. Cir. 2024) (quoting 9 U.S.C. § 202). But the arbitral award here falls comfortably within how that reservation has been construed by the Court of Appeals.

As the Court of Appeals has held, the term "commercial" has a "broad compass" in the international arbitration context: it simply requires that the parties' relationship "have a connection to commerce." *Gov't of Belize*, 794 F.3d at 104–05. Here, DTEK Krymenergo established energy infrastructure in Crimea that, before its 2015 expropriation by the Russian Federation (including for some time after Crimea was annexed), provided electricity to more than 780,000 customers. Award ¶¶ 191–93. Russia's decision to nationalize that economically productive infrastructure— Ukraine-Russia BIT notwithstanding—plainly placed Russia and DTEK Krymenergo in a relation with "connections to commerce." *Zhongshan*, 112 F.4th at 1063–64 (relationship between Nigeria

11

and Chinese developer operating there was commercial in light of, among other features, developer's "investment in a money-making enterprise," Nigeria's collection of "revenue" from developer's investment, and BIT's "express[] design[] to promote commerce"); *see also Stabil*, 2024 WL 5093202, at *5 (award under Ukraine-Russia BIT regarding Russia's seizure of Crimean petrol stations arose out of commercial relationship because "[o]wning, operating and supplying petrol stations has an obvious connection to commerce") (quotation marks omitted). Indeed, the Court of Appeals has specifically stated that, if a BIT "confers third-party rights upon commercial investors" and "makes [them] a standing offer . . . to arbitrate disputes involving their third-party rights," any resulting arbitral award "satisfies the commercial reservation." *Zhongshan*, 112 F.4th at 1065; *see also Stileks*, 985 F.3d at 880 ("[T]he primary goal of the [New York] Convention is to facilitate the recognition and enforcement of arbitral awards.").

    Against this authority, Russia maintains that it has no commercial relationship with DTEK Krymenergo because "government seizure of private property is a sovereign act excluded from the commercial sphere." *Stabil*, 2024 WL 5093202, at *5; *see* MTD at 23. But just as in *Stabil*, Russia's argument "relies on inapt cases discussing the contours of the FSIA's commercial activity exception." *Stabil*, 2024 WL 5093202, at *5; *see* MTD at 23 (citing, inter alia, *Ivanenko v. Yanukovich*, 995 F.3d 232, 238–39 (D.C. Cir. 2021)). That statutory exception to sovereign immunity, which DTEK Krymenergo does not invoke here, involves a more "restrictive" definition of "commercial" than the New York Convention does. *Gov't of Belize*, 794 F.3d at 104–05. And the Court of Appeals has distinguished the definition of "commercial" across the two contexts, holding that conduct can be "commercial" for purposes of the New York Convention even if it involves "powers peculiar to sovereigns"—like expropriation. *Id.* at 105. Russia has thus failed

to rebut DTEK Krymenergo's showing that the New York Convention—and the arbitration exception more generally—applies to this case.[5]

## B. Personal Jurisdiction

"[U]nder the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (quotation marks omitted). For the reasons already discussed, the Court possesses subject matter jurisdiction over DTEK Krymenergo's petition via the FSIA's arbitration exception. And Russia does not contest the adequacy of DTEK Krymenergo's service, which was made via diplomatic channels under 28 U.S.C. § 1608(a)(4). *See* ECF No. 9. Instead, Russia's only argument against the Court's exercise of personal jurisdiction is that it "would not comport with due process" because "this case has no connection to the United States." MTD at 30. As the Federation acknowledges, however, the Court of Appeals has held that foreign states are not "persons" protected by the Fifth Amendment's Due Process Clause—meaning that the Clause's "minimum contacts" requirement "poses no obstacle" to this Court's exercise of personal jurisdiction over Russia. *Price*, 294 F.3d at 96–99. Even as Russia "maintains that *Price* was wrongly decided and should be overturned," MTD at 30, the Court is bound to apply it here.

## IV. Motion to Stay

"[W]holly apart from the question of jurisdiction under the [FSIA]," Russia seeks a stay—presumably as to even its motion to dismiss—on essentially prudential grounds. MTS at 1. Russia

---

[5] Because the Court is persuaded that it possesses subject matter jurisdiction over DTEK Krymenergo's petition pursuant to the arbitration exception, 28 U.S.C. § 1605(a)(6), it sees no need to analyze whether it also has subject matter jurisdiction over the petition under the FSIA's waiver exception, 28 U.S.C. § 1605(a)(1). *See NextEra*, 112 F.4th at 1099–1100 (acknowledging that it is "unsettled" in this Circuit whether signing the New York Convention implicitly waives foreign sovereign immunity and affirming district court's jurisdiction under the arbitration exception alone).

points first to the ongoing proceedings at The Hague Court of Appeal to set aside the arbitral award; it argues that the Court should stay this action pending their resolution since, if the award is set aside, that would "moot this case in its entirety." *Id.*

When evaluating a request to stay confirmation proceedings based on the pendency of set-aside proceedings elsewhere, courts must evaluate the traditional stay considerations—"interest in judicial economy and relative hardships to the parties"—"through the lens of" two additional factors particular to arbitration. *Hulley Enters. Ltd. v. Russian Fed'n*, 2022 WL 1102200, at *9 (D.D.C. 2022). Specifically, the Court would "abuse its discretion" if in assessing the propriety of such a stay it did not consider (1) "the general objectives of arbitration," namely, "the expeditious resolution of disputes and the avoidance of protracted and expensive litigation," and (2) "the status of the foreign proceedings and the estimated time for those proceedings to be resolved." *Stileks*, 985 F.3d at 879–80.

Taking those factors into account, a stay is not warranted based on the ongoing proceedings at The Hague. Denying Russia's motion to dismiss on jurisdictional grounds, as the Court does today, involves no outsized use of judicial resources. Nor does it mean that confirmation of the underlying arbitral award—the first judicial event that would be in tension with The Hague's possibly setting that award aside—is imminent. *See P&ID*, 27 F.4th at 772 ("[A] foreign court's order ostensibly setting aside an arbitral award has no bearing on the district court's jurisdiction and is instead an affirmative defense properly suited for consideration at the merits stage."). Instead, the parties will first need to brief the merits of Russia's defenses to enforcement under the New York Convention. *Cf. RREEF Infrastructure (G.P.) Ltd. v. Kingdom of Spain*, 2021 WL 1226714, at *3 (D.D.C. 2021) ("If this Court were to affirm an award that ICSID later annuls,

14

more expensive litigation involving more complex issues would result.") (quotation marks and alterations omitted).

To be sure, staying the case now would preserve the possibility that the parties could avoid that step entirely, in the event that The Hague sets aside the award. But the defenses Russia raises here will likely overlap substantially with those the parties have already briefed—both at the motion to dismiss stage and before The Hague. In light of that fact, as well as the fact that the arbitration began seven years ago and the underlying expropriation occurred more than a decade ago, the Court sees no compelling reason why merits briefing should not proceed even as The Hague proceedings do also. Indeed, any other course would seem inconsistent with "arbitration's aim of expeditious dispute resolution." *Hulley*, 2022 WL 1102200, at *6, *9. That is especially true where Russia instituted the set-aside proceedings *after* DTEK Krymenergo instituted this enforcement action (and only moved to stay an additional seven months after that, once its motion to dismiss was fully briefed), and has offered no estimate of when the set-aside proceedings might conclude.[6] *Cf. Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 193 (D.D.C. 2016) (staying case pending foreign set-aside proceedings where "a decision by the Swedish court [wa]s expected in the coming months").

For similar reasons, the balance of the hardships does not favor a stay. Russia argues that it would face "very real harm" if its assets are seized pursuant to an order enforcing the arbitral award and The Hague "subsequently 'determine[s] that the award was improper.'" MTS at 7 (quoting *Matter of Arb. of Certain Controversies Between Getma Int'l & Republic of Guinea*, 142

---

[6] Russia incorrectly asserts that "the set-aside proceedings were initiated prior to the U.S. enforcement action." MTS at 10. DTEK Krymenergo petitioned to confirm the arbitral award in November 2023, *see* ECF No. 1, and Russia applied to the Hague Court of Appeal to set aside the award in February 2024, *see* ECF No. 14-1 ¶ 3.

F. Supp. 3d 110, 118 (D.D.C. 2015)). But again, there is no imminent prospect of confirming the award, much less executing it. Meanwhile, if the Court were to delay confirmation briefing pending The Hague's set-aside decision and The Hague did *not* set aside the award, the result would be a substantial delay in DTEK Krymenergo's ability to potentially recover its duly owed compensation. As DTEK Krymergo points out, that delay could itself affect the likelihood of recovery, since other Russian creditors are proceeding with similar confirmation actions in this District and could deplete the same American-held assets that DTEK Krymenergo hopes to attach. *See* MTS Opp. at 3 & n.1 (compiling cases).

In its reply, Russia argues that a stay is warranted based on several pending cases that, in its view, could affect the disposition of this matter. *See* ECF No. 22 (MTS Reply) at 14–17. But by now, only one of the cases that Russia identifies indeed presents an open question. In March 2025, the Supreme Court heard argument in *Devas Multimedia Priv. Ltd. v. Antrix Corp.*, Nos. 23-1201, 24-17, to decide "[w]hether the exercise of personal jurisdiction over a foreign state under the Foreign Sovereign Immunities Act requires satisfaction of the minimum-contacts test." But at oral argument, counsel for all parties appeared to agree that the answer to that question was "no," and to focus instead on other possible reasons—largely not raised in the courts below—why jurisdiction over the foreign-government-owned corporation might not be proper. *See* Oral Arg. Tr. 32:47–25:36. Russia suggests that *Devas* could overturn the Court of Appeals' decision in *Price* and "hold[] that the exercise of personal jurisdiction over foreign states must comport with due process." MTS at 15. But that outcome appears unlikely, and at least speculative. *Devas* thus does not create the "rare circumstances" in which DTEK Krymenergo could be "compelled to

stand aside while [another] litigant . . . settles the rule of law that will define the rights of both."[7] *Nat'l Indus. for Blind v. Dep't of Veterans Affs.*, 296 F. Supp. 3d 131, 137 (D.D.C. 2017).

## V.     Conclusion

For the foregoing reasons, the Court denies Russia's motion to dismiss, ECF No. 13, and its motion to stay, ECF No. 19. Within two weeks of the issuance of this Opinion, the parties shall file a Joint Proposed Scheduling Order governing further proceedings in this matter. An Order will accompany this Opinion.

DATE:  April 17, 2025

CARL J. NICHOLS
United States District Judge

---

[7] Russia also argued that a stay was warranted due to the pendency of (1) *Hungary v. Simon*, 604 U.S. ___ (2025), (2) the petition for rehearing in *NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024), and (3) the petition for certiorari in *Zhongshan Fucheng Indus. Inv. Co. Ltd. v. Fed. Republic of Nigeria*, 112 F.4th 1054 (D.C. Cir. 2024). Russia speculated that *Simon* could disrupt Circuit precedent holding that "a foreign state bears the ultimate burden of proving that an exception to immunity under the FSIA does not apply." MTS at 15. But *Simon*—which in any event pertained to the expropriation rather than arbitration exception to the FSIA—has now been decided and expressly did not reach "who bears the burden of production to prove (or disprove) that expropriated property has a commercial nexus with the United States" and "[w]ho bears the burden of persuasion on that issue." 604 U.S. at 9–10, n.1. As for *NextEra* and *Zhongshan*, the petition for rehearing was denied and the petition for certiorari was dismissed, respectively. Those cases' applications of the arbitration exception are thus final and binding on the Court.